# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

COREY BERRY,                          :
                                      :
                Appellant,            :        K20A-08-002 JJC
                                      :
        v.                            :
                                      :
MITRA QSR KNE LLC, DBA                :
KENTUCKY FRIED CHICKEN,               :
                                      :
                Appellee.             :

Submitted: December 1, 2020
Decided: February 16, 2021

## MEMORANDUM OPINION AND ORDER

*Upon Consideration of Appellant's Appeal from the Decision of
the Industrial Accident Board –* **AFFIRMED**

James R. Donovan, Esquire, & Alexis N. Stombaugh, Esquire, Doroshow,
Pasquale, Krawitz & Bhaya, Dover, Delaware, *Attorneys for the Appellant.*

Joseph Andrews, Esquire, & Taylor E. Trapp, Esquire, Law Office of Joseph
Andrews, Dover, Delaware, *Attorney for the Appellee.*

**Clark, J.**

Appellant Corey Berry appeals an Industrial Accident Board (hereinafter "IAB" or "Board") decision in favor of MITRA QSR KNE LLC, dba Kentucky Fried Chicken (hereinafter "KFC"). In his appeal, Mr. Berry contends that substantial evidence did not support the IAB's finding that no further compensation was due because his injuries had resolved. For the reasons discussed below, the record contains substantial evidence to support the Board's findings. Accordingly, its decision must be **AFFIRMED**.

## FACTS OF RECORD AND PROCEDURAL BACKGROUND

On April 24, 2019, Mr. Berry fell at work. The parties stipulated that he suffered a work injury. They did not agree, however, regarding the duration of Mr. Berry's disability, the extent of his injuries, or whether future intended treatment would be reasonable, necessary, and related to the accident.[1]

Upon KFC's petition to terminate benefits, the IAB held a virtual hearing on June 30, 2020. It issued its written decision on July 9, 2020. The Court recognizes significant evidence in the record that supported Mr. Berry's claim. Namely, his treating orthopedic surgeon, Dr. Zaslavsky, testified that Mr. Berry's fall at KFC caused cervical myelopathy, which will in turn require a future neck surgery. Mr. Berry's testimony, if believed by the Board, would have further supported that opinion. Nevertheless, the Court focuses its review on whether substantial evidence supported KFC's petition to terminate benefits.

The IAB record included a stipulation, Mr. Berry's testimony, and the testimony of two medical experts offered through depositions. Dr. James Zaslavsky

---

[1] While the parties stipulated prior to the IAB hearing that the Board should consider whether Mr. Berry suffered back, leg, head, and cervical injuries, the record contained no expert evidence substantiating an injury other than the neck injury that allegedly involved myelopathy. As a result, the parties assume in their briefing that the only injury at issue is cervical myelopathy, and the only treatment at issue is a future neck surgery. The Court has addressed the issues accordingly.

testified on Mr. Berry's behalf as his treating orthopedic surgeon. Another orthopedic surgeon, Dr. Lawrence Piccioni, testified as KFC's defense medical examiner.

At the hearing, Mr. Berry stated that he injured himself at work during an unwitnessed slip and fall accident. He described that he landed knee first, hit his right shoulder, and then hit his head on a door when he fell. Furthermore, Mr. Berry stated that, after the accident, his supervisor instructed him to go home. Nevertheless, he testified that he disregarded his supervisor's instructions and went to the hospital. At the hospital, he complained of shoulder pain but had no neck complaints.

The record contains inconsistencies regarding who told Mr. Berry to go to the emergency room on the day of the accident. Namely, Mr. Berry changed his testimony after KFC's counsel confronted him with a Kent General Hospital (hereinafter "KGH") medical record. In addition, the same record contains a discrepancy regarding Mr. Berry's description of the mechanism of injury when compared to other accounts of his fall. Namely, Mr. Berry told his medical providers and the defense medical examiner that he either did, or did not, strike his head in the accident.

Thirteen days after his fall, on May 7, 2019, Mr. Berry attended a family doctor appointment at Westside Family Healthcare. At that visit, he requested that his doctor return him to full duty. Although the doctor declined to do so, she released him to light-duty. In reliance on that release, Mr. Berry returned to work. At some point after he returned to work, KFC terminated him for reasons unrelated to the accident.

Mr. Berry next received an MRI on May 31, 2019. The MRI revealed diffuse disc desiccation with loss of disc spaces between each of the C4 to C7 vertebra. Neither party introduced the MRI report into evidence. Accordingly, the two

3

competing medical experts' descriptions of the MRI's findings comprise the record regarding the study's findings. On one hand, Dr. Zaslavsky testified that it showed both degenerative changes and acute injuries, including severe central spinal cord compression. On the other hand, Dr. Piccioni testified that the cervical findings shown in the 2019 MRI resembled Mr. Perry's eleven-year-old imaging study taken at KGH on July 22, 2008.[2] Furthermore, Dr. Piccioni testified that the 2019 MRI revealed no conditions consistent with myelopathy. Rather, he testified that the 2019 study showed only degenerative changes -- again changes consistent with the July 2008 film. Finally, Dr. Piccioni discussed how the radiologist read the 2019 study. According to Dr. Piccioni, the radiologist did not describe conditions consistent with myelopathy in his report.

Mr. Berry began treatment with Dr. Zaslavsky in late June 2019 for neck pain and extremity symptoms. Dr. Zaslavsky related those symptoms to the accident. At the outset, Dr. Zaslavsky expressed his concern that a large disc bulge compressed Mr. Berry's spinal cord. At that same visit, Dr. Zaslavsky explained myelopathic symptoms to Mr. Berry. He cautioned him to remain watchful regarding their progressive nature.

Mr. Berry next visited Dr. Zaslavsky in August 2019. At that point, Mr. Berry described decreased motor skills, grip weakness, and significant neck pain. By the next visit, Dr. Zaslavsky had formally diagnosed Mr. Berry with myelopathy and discussed potential future surgery. At a January 22, 2020 visit, Mr. Berry told Dr. Zaslavsky that he wanted the surgery.

At the IAB hearing, Mr. Berry testified that he was unable to work because of difficulty with balance, significant pain running from his neck down to his hip, and the need for support when he walked. For support, he testified he needed a cane.

---

[2] The record does not reveal whether the 2008 study was an MRI, Xray, or CT Scan.

4

Mr. Berry described spending his days sitting in his room smoking marijuana to alleviate pain. Nevertheless, he acknowledged that he had no prescription for medical marijuana and that Dr. Zaslavsky had told him to stop smoking it illegally. His days further consisted of playing on his phone and playing video games. Additionally, he testified that he could walk no farther than thirty yards and that his longest walks were across the street with his wife's assistance.

Mr. Berry said that he wanted the cervical surgery that Dr. Zaslavsky recommended. He nevertheless remained open to trying other treatments. When questioned by an IAB member regarding why he forwent recommended nerve block injections, Mr. Berry stated that he refused them because he did not trust needles.

The record included two completely divergent expert opinions. One expert, Dr. Zaslavsky, testified that the surgery was reasonable, necessary, and related to his fall. Specifically, Dr. Zaslavsky testified that Mr. Berry described multiple subjective symptoms consistent with myelopathy. He also testified that he, as Mr. Berry's treating physician, observed objective signs that supported that conclusion. According to Dr. Zaslavsky, Mr. Berry's myelopathy requires surgery. In summary, Dr. Zaslavsky related Mr. Berry's condition, ongoing total disability, and need for future surgery to the accident. In fact, Dr. Zaslavsky felt that Mr. Perry's condition had progressed to the point that it would border on medical malpractice to not recommend surgery.

In contrast, Dr. Piccioni opined that Mr. Berry suffered only a cervical strain/sprain injury that had resolved by May 7, 2019, shortly after his fall. Dr. Piccioni performed his defense medical examination on March 31, 2020. When doing so, he was the last doctor to examine Mr. Berry prior to the IAB hearing on June 30, 2020.

Dr. Piccioni's testimony included reasonable grounds for the Board to have accepted his opinion. First, he emphasized that, pursuant to his record review, Dr.

5

Zaslavsky was the only medical provider that recorded signs or symptom consistent with myelopathy. Second, Dr. Piccioni observed no signs of myelopathy when he examined Mr. Berry. Nor, according to Dr. Piccioni, did Mr. Berry report symptoms consistent with that condition. In this regard, Dr. Piccioni emphasized that, because myelopathy is progressive, the absence of signs or reported symptoms during his examination would not be possible if the condition in fact existed. Third, Dr. Piccioni opined, without objection, that Mr. Berry attempted to magnify and exaggerate his symptoms at the examination. On cross-examination, Dr. Piccioni reiterated his opinion that Mr. Berry was malingering and exaggerating. He corroborated his opinion by observing that although Mr. Berry testified that he had pervasive issues with balance and needed a cane to walk, he observed none of those during the examination. In fact, he testified that Mr. Berry came to the appointment without a cane.

The record also includes evidence of two incidents after the work injury. First, Mr. Berry told his physical therapist that he fell from a friend's cooler on August 30, 2019 and then suffered increased pain when walking. Furthermore, on September 4, 2019, Mr. Berry reported that he heard a loud pop after he turned his head to talk to his wife. Notwithstanding the work accident and these two subsequent incidents, Mr. Berry reported his neck to be only a "little sore" at an October 2019 physical therapy appointment.

In its written decision, the Board cited "numerous examples of [Mr. Berry's] lack of credibility." It focused on the inconsistency of his testimony when compared to the statements attributed to him in his medical records. The IAB also focused on his inconsistent descriptions of the mechanism of his injury. It also recited his repeated choice to self-medicate with marijuana despite contrary instructions from his treating physician. Finally, the Board considered Mr. Berry's contention that he

6

refused injections because he feared needles. It found that claim to be incredible given his stated willingness to undergo invasive cervical surgery.

Moreover, the Board accepted Dr. Piccioni's opinions over Dr. Zaslavsky's opinions. Both experts agreed that absent myelopathy, any surgery for Mr. Berry would be inappropriate. When the Board placed controlling weight on Dr. Piccioni's opinions, it inferred that if Mr. Berry in fact had myelopathy, (1) Dr. Piccioni would have observed signs of myelopathy at the time of his March 31, 2020 exam, and (2) Mr. Berry would have reported symptoms of myelopathy to Dr. Piccioni during that examination. According to Dr. Piccioni, neither occurred.

After weighing the evidence, the IAB found that KFC owed Mr. Berry no compensation for the fall for any point past May 7, 2019. Mr. Berry then filed this appeal.

**ARGUMENTS OF THE PARTIES**

Mr. Berry challenges the Board's findings regarding credibility. Specifically he argues that after recognizing the totality of the Board's errors, substantial evidence does not support its decision. To substantiate this argument, he identifies the following alleged errors: (1) the Board erred when finding that Mr. Berry's marijuana use made him less credible; (2) the Board improperly relied on common experience when it inferred that Mr. Berry's neck pain could have stemmed from playing video games; (3) it erred when finding him less credible because he rejected injections on one hand, while expressing a willingness to undergo an invasive neck surgery on the other; and (4) it mistakenly found that Mr. Berry first mentioned his neck symptoms on May 7, 2020 because he had mentioned them earlier on May 1, 2020. Finally, Mr. Berry contends that the Court owes the Board less deference regarding its credibility findings because the Board conducted a virtual hearing.

7

In response, KFC argues that only the IAB, as the finder of fact, can decide issues of credibility. KFC also highlights evidence that it alleges constitutes substantial evidence in support of the Board's decision. It emphasizes that the two expert opinions in this case directly conflicted with one another. According to KFC, it follows that because one of those expert's opinions supported the Board's decision to terminate benefits, there is substantial evidence of record to support the Board's decision. Finally, it argues that the IAB lawfully adopted an emergency rule that permits virtual hearings during the Covid-19 pandemic. KFC contends that the rule does nothing to diminish the deference due the IAB regarding findings of credibility.

## STANDARD OF REVIEW

KFC petitioned the IAB to terminate Mr. Berry's compensation benefits. Accordingly, the burden of proof at the hearing rested on KFC.[3] When reviewing the Board's decision on appeal, the Superior Court reviews whether the decision was supported by substantial evidence and whether the Board committed an error of law.[4] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] It is "more than a scintilla but less than a preponderance of the evidence."[6]

Furthermore, on appeal, the Court views the facts in the light most favorable to the prevailing party below.[7] Moreover, the Court does not determine questions of

---

[3] *Walt v. Delaware Home & Hosp. for Chronically Ill*, 2007 WL 1947370, at *2 (Del. July 5, 2007) (TABLE).
[4] *Bullock v. K-Mart Corp.*, 1995 WL 339025, at *2 (Del. Super. May 5, 1995) (citing *General Motors v. Freeman*, 164 A.2d 686, 688 (Del. 1960)); *Murphy & Landon, P.A. v. Pernic*, 121 A.3d 1215, 1221 (Del. 2015).
[5] *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).
[6] *Washington v. Delaware Transit Corp.*, 226 A.3d 202, 210 (Del. 2020) (citation omitted).
[7] *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del. 1965).

8

credibility, or make its own factual findings.[8]  Absent an error of law, which would be reviewed *de novo*, a decision of the IAB supported by substantial evidence must be upheld unless the Board abused its discretion.[9]  The Board abuses its discretion when its decision exceeds the bounds of reason in view of the circumstances.[10]  Finally, the Court gives significant weight to the IAB regarding its "application of legal principles in the specialized context of our state's workers' compensation scheme, because the IAB has the occasion to give life to that scheme on a weekly basis in the many cases that come before it."[11]

## ANALYSIS

Mr. Berry's arguments can be distilled into two parts.  First, he argues that the Board should have found him to be credible.  Given that error, Mr. Berry argues that there was not substantial evidence in the record to support the Board's adverse decision.  Second, he contends that the IAB's decision to hold a virtual hearing alters the deference due the Board on appeal regarding its credibility findings.

As to the first argument, the record contains a sufficient quantum of evidence to constitute substantial evidence in support of the Board's decision to terminate benefits after May 7, 2019.   The Court owes deference to the IAB regarding issues of credibility, both as to Mr. Berry and the expert medical witnesses.  As to the second argument, the Board's decision to hold hearings virtually during the pandemic does not alter the traditional deference due the Board regarding questions of credibility.

---

[8] *Bullock*, 1995 WL 339025, at *2 (citing *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66 (Del. 1965)).
[9] *Hoffecker v. Lexus of Wilmington*, 2012 WL 341714, at *1 (Del. Feb. 1, 2012).
[10] *Id.*
[11] *Christiana Care Health Services v. Davis*, 127 A.3d 391, 395 (Del. 2015).

**The Court must defer to the Board's findings regarding the credibility of Mr. Berry's testimony; given this deference and Dr. Piccioni's expert opinion, the record contains substantial evidence to support the Board's decision.**

Because the Court does not hear the evidence, it cannot make credibility determinations upon appellate review.[12]  Moreover, where substantial evidence exists in a record that supports two reasonable, but contrary results, the Board's decision controls.[13]  Here, Mr. Berry acknowledges that to reverse the Board's decision, the Court would need to accept all, or nearly all, of his numerous arguments.[14]

At the outset, the Court recognizes that Dr. Zaslavsky's expert opinion and Mr. Berry's testimony would have provided substantial evidence in support of Mr. Berry's position if he had prevailed before the IAB.  This appeal, however, turns on whether there was substantial evidence supporting the contrary result.  Accordingly, the Court reviews the record for evidence supportive of KFC's position.   When doing so, it does not ignore the evidence supportive of Mr. Berry's claim.  Nor does it imply that Mr. Berry's case was wholly without merit.   Rather, this focus reflects the scope of the Court's review.

In this regard, Mr. Berry's testimony conflicted at times with statements in his medical records that were attributed to him.  The Board recognized and the record supports that Mr. Berry inconsistently described the nature of his injuries and symptoms to various medical providers.  Many of the medical records varied on the

---

[12] *Bullock*, 1995 WL 339025, at *2 (citing *Johnson v. Chrysler Corp*., 213 A.2d 64, 66 (Del. 1965)).

[13] *See Disabatino Bros., Inc. v. Wortman*, 453 A.2d 102, 106 (Del. 1982) (citing *General Motors v. Veasey*, 371 A.2d 1074, 1076 (Del. 1977), *overruled in part on other grounds by Duvall v. Charles Connell Roofing*, 564 A.2d 1132 (Del. 1989)) (recognizing that in cases, when "the substantial evidence requirement [is] satisfied either way," the Court cannot overturn the Board's choice on appeal).

[14] Appellant Op. Br. at. 14.

location of reported injuries and degree of pain. For instance, the Board's decision assigned weight to KGH's day-of-injury record. That KGH record recorded that Mr. Berry denied hitting his head when he fell. It also did not mention neck pain. In addition, Mr. Berry later told his family doctor, eight days after the accident, that he had not hit his head. One year later, at his defense medical examination, he likewise did not tell Dr. Piccioni that he did struck his head. In contrast, Mr. Perry (1) told Dr. Zaslavsky that he had struck his head and (2) testified at the hearing that he had.

Furthermore, the record demonstrates that Mr. Berry failed to disclose a prior 2008 neck injury and relevant diagnostic test to his medical providers or to Dr. Piccioni. He may have simply forgotten it. Nevertheless, the 2008 test ordered at KGH to evaluate a prior neck injury showed substantially similar degenerative changes as shown in the 2019 MRI study. The Board permissibly considered this prior treatment when it judged Mr. Berry's credibility. It also permissibly considered the two imaging findings when it evaluated Dr. Zaslavsky's credibility.

In addition, Mr. Berry's testimony at the hearing differed in other respects when compared to what he told his medical providers. Namely, he testified that his supervisor told him to go home immediately after the accident. The KGH records and Dr. Piccioni described something different; rather, those accounts provided that his supervisor told him to seek immediate medical care. Once confronted with the KGH record, Mr. Berry altered his testimony in front of the Board. He then testified that his supervisor told him to go to a walk-in clinic rather than go home. Whether these differing accounts are material and the degree to which they should have impacted the Board's assessment of Mr. Berry's credibility were issues for the IAB to determine – not for the Court on appeal.

Furthermore, Mr. Berry told the Board he was totally disabled and had remained unable to work because of the accident. However, within two weeks of the accident, on May 7, 2019, Mr. Berry requested that his family doctor return him

11

to full duty. Furthermore, Mr. Berry admitted to Dr. Zaslavsky two months after the accident that he was working thirteen hours a week, notwithstanding his claim of total disability. Moreover, Mr. Berry testified during the IAB hearing that he was unable to find employment because he could not lift over twenty pounds. He confirmed, however, that he had prior experience in sales and customer service. When questioned regarding whether he sought employment in those fields, that do not require lifting, he responded simply that there was nothing available. Accordingly, the Board permissibly inferred that he did not try. Conflicting testimony regarding Mr. Berry's work capabilities and efforts to find replacement work provided further acceptable grounds for the IAB to discredit Mr. Berry's testimony.

The Board also relied in part upon his desire to undergo cervical surgery notwithstanding his reluctance to attempt nerve blocks as an alternative treatment. His stated reason for refusing injections was a fear of needles. The Court, given the nature of its appellate review, cannot find that the Board erred when considering this when evaluating his credibility.[15]

Mr. Berry also argues that the Board improperly considered his marijuana use when it assessed his credibility. In support, he advances public policy arguments and emphasizes the decriminalization of marijuana.[16] In one sense, the Court could

---

[15] The Court acknowledges the Delaware Supreme Court's decision in *Brittingham v. St. Michael's Rectory*, 788 A.2d 519, 526 (Del. 2002), cited by Mr. Berry. That decision examined 19 *Del. C.* §2353 (a)'s provision providing for forfeiture of benefits when a claimant refuses reasonable surgical, medical, or hospital treatment. The *Brittingham* decision recognizes a multi-part analysis necessary before finding such a forfeiture. *Brittingham*, 788 A.2d at 525. Here, the IAB considered Mr. Berry's refusal for a purpose other than for forfeiture. Namely, it considered it simply as an additional item relevant to its overall credibility determination. When doing so, the Board did not act improperly.

[16] *See* 16 *Del. C.* § 4764 (c) (2) (providing that possession or use of personal use quantities of marijuana engender civil penalties). Although such use may no longer be criminal, *it remains illegal* unless the possessor or user is a qualified patient or designated caregiver who has been issued a valid registry identification card. 16 *Del. C.* § 4902A.

12

properly decline to address this argument because Mr. Berry did not object to the evidence during the IAB hearing.[17] Nevertheless, the Court more properly rejects Mr. Berry's argument on substantive grounds. Namely, the Court declines to hold that the IAB erred when it considered that Dr. Zaslavsky told Mr. Berry *not* to self-medicate illegally with marijuana. Were the Court to accept Mr. Berry's argument, such a holding would prohibit the IAB from considering a claimant's refusal to follow a doctor's medication instructions when evaluating the claimant's credibility. Such a result would be inappropriate.

Finally, and independently dispositive, the Board permissibly assigned controlling weight to Dr. Piccioni's opinions. The IAB demonstrated, in its written order, that it considered the testimony of the competing experts. As with fact witnesses, the Board has the exclusive purview to make credibility determinations regarding expert witnesses.[18] In the medical expert context, "it is well settled that the IAB is free to choose between conflicting medical testimony, and [when it relies upon one of the expert's opinions, it] will constitute substantial evidence for the purposes of appeal."[19]

Here, Dr. Piccioni testified that Mr. Berry appeared for a defense medical examination without the use of a cane, had normal balance, and walked without difficulty. Given this testimony, the Board could have reasonably found that Dr. Zaslavsky's opinion that Mr. Berry required a cane or needed to hold a wall to walk down a hallway was incorrect and, in turn, deserved minimal weight.

---

[17] *See Standard Distributing, Inc. v. Hall*, 2005 WL 950118 at *2 (Del. Super. Ct. Mar. 18, 2005) (citation omitted) (explaining that it is settled Delaware law that failure to object to an issue during an IAB hearing waives the issue on appeal).

[18] *See Cottman v. Burris Fence Const.*, 2006 WL 3742580, at *3 (Del. Dec. 19, 2006) (TABLE) ("[w]hen ... there is contradictory expert testimony supported by substantial evidence, it is within the Board's discretion to accept the testimony of one physician over another.").

[19] *Glanden v. Land Prep, Inc.*, 918 A.2d 1098, 1103 (Del. 2007).

Furthermore, both expert witnesses testified that myelopathy is a progressive and non-resolving condition. Pursuant to a substantial evidence review, the Board did not err when it inferred that if Mr. Berry had signs and symptoms of myelopathy when treating with Dr. Zaslavsky, he should have displayed those signs and symptoms at his defense medical examination. Thus, it permissibly considered Dr. Piccioni's testimony that Mr. Berry described no symptoms of myelopathy or any other permanent injury related to his work accident. Finally, Dr. Piccioni's unchallenged testimony that Dr. Zaslavsky was the only medical provider who recorded any signs or symptoms of myelopathy provided further support for the IAB's decision.

Additionally, when the Board considered the competing medical opinions, it had before it both doctors' testimonies regarding the MRI study. Dr. Zaslavsky described the findings to be supportive of myelopathy. However, it accepted Dr. Piccioni's opposite opinion -- that the film revealed no condition consistent with myelopathy and that if that condition existed, it would have. It also permissibly accepted Dr. Piccioni's opinion that no further benefits were due Mr. Berry after May 7, 2019.

Finally, Dr. Piccioni's testified that Mr. Berry was a malinger who exaggerated his symptoms. Though Dr. Zaslavsky disagreed, *Mr. Berry did not object* to Dr. Piccioni's malingering opinion at the hearing. In fact, Dr. Piccioni reiterated that opinion when questioned on cross-examination. If Mr. Berry exaggerated his symptoms, the Board could have reasonably found that Mr. Berry lacked credibility. Because Dr. Zaslavsky's opinion relied, in part, on Mr. Berry's statements regarding his condition, the IAB could also have reasonably found that Dr. Zaslavsky's opinion deserved less weight as a result.

14

**The Board's decision to conduct a virtual hearing does not alter the deference due the Board when deciding questions of witness credibility.**

As a final matter, Mr. Berry argues that the Court should not defer to the Board's credibility findings because the Board conducted the hearing virtually. He cites no authority in support of that contention. Nor does he identify any specific difficulty with the hearing. Rather, while he does not allege the virtual hearing to be improper, he contends that it alters the nature of the Court's appellate review. In support, he asserts only that the Board could not adequately observe the claimant or appreciate his body language and facial expressions to the same degree as possible in a live hearing.

The IAB, in accordance with a recent procedural order, conducted Mr. Berry's hearing through the WebEx platform.[20] That order provides that, due to Covid-19, "scheduled matters *shall* proceed by video hearing."[21] It is axiomatic that the Board has the authority to control the nature of its proceedings.[22] In fact, Mr. Berry concedes the order's lawfulness. Here, as in Delaware's courts, emergency circumstances created by the pandemic compel such reasonable measures to protect the safety of participants.[23]

In this case, Mr. Berry was the only virtual witness during the IAB hearing. The parties offered both doctors' testimonies through depositions. With regards to Mr. Berry's testimony, the record reveals no difficulty with the video platform

---

[20] Appellee Ans. Br. Ex. 2, *Industrial Accident Board Order* dated May 11, 2020 [hereinafter "*IAB Covid Order*"].

[21] *IAB Covid Order* at 2 (emphasis added).

[22] *See* 19 *Del. C*. § 2301A (i) ("[t]he Board may promulgate its own rules of procedure for carrying out its duties consistent with Part II of this title and the provisions of the Administrative Procedures Act [§ 10101 et seq. of Title 29].").

[23] *See State v. Kolaco*, 2020 WL 7334176, at *1-12 (Del. Super. Dec. 14, 2020) (discussing, in light of the Covid-19 pandemic, the sufficiency of virtual proceedings in the context of criminal suppression motions).

chosen by the Board. Mr. Berry could view and address the one exhibit addressed during his examination. When he testified, the Board and attorneys could fully observe and hear him. Give these circumstances and Mr. Berry's failure to identify any aspect of the record that supports his argument that the Board could not appropriately assess his credibility, the Court will not alter its scope of review.

On balance, given the lawfulness of the IAB's order, the Court would act illogically if it usurped the role of independently assessing witness credibility on appeal. Here, the Court had no opportunity to observe any witness, physically *or* virtually. Consistent with normal times, these temporary safety measures do not change the fact that the IAB is the only entity suited to be the finder of fact. As a result, the Court declines to alter the well-recognized rule that defers to the Board's judgment regarding issues of witness credibility.

## CONCLUSION

For the reasons discussed, substantial evidence supported the Board's decision to grant KFC's petition. Furthermore, the Board's credibility decisions and decisions regarding the weight due the evidence do not exceed the bounds of reason. As a result, the Board's decision in this matter must be **AFFIRMED**.

**IT IS SO ORDERED**.

/s/Jeffrey J Clark
Judge

16